UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| DOMENIC SPAGNOLO, | Case No. |
| Plaintiff, | **COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| INUVO, INC., RICHARD HOWE, G. KENT BURNETT, GORDON CAMERON, CHARLES MORGAN, and PATRICK TERRELL, | 1. **VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9** |
| Defendants. | 2. **VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |

---

Domenic Spagnolo ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This action is brought by Plaintiff against Inuvo, Inc. ("Inuvo" or the "Company") and the members of Inuvo's board of directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between Inuvo and ConversionPoint Technologies Inc. ("ConversionPoint"). The newly formed combined company will be ConversionPoint Holdings, Inc. ("ConversionPoint Holdings").

2.      On November 2, 2018, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the ConversionPoint, pursuant to which, Inuvo

1

shareholders will receive $0.45 in cash and 0.18877 shares of ConversionPoint Holdings common stock for each share of Inuvo stock they own (the "Merger Consideration"). Each share of ConversionPoint common stock will be converted into the right to receive 0.97853 shares of ConversionPoint Holdings common stock. ConversionPoint shareholders will own approximately 70.76%, and Inuvo shareholders will own approximately 29.24%, of ConversionPoint Holdings common stock.

3. On December 17, 2018, the Board authorized the filing of a materially incomplete and misleading preliminary joint proxy statement/prospectus (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act, that recommends Inuvo shareholders vote in favor of the Proposed Merger.

4. While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections of both companies; (ii) the valuation analyses performed by the Company's financial advisor, Canaccord Genuity LLC ("Canaccord"), in support of its fairness opinion; and (iii) the background of the Proposed Merger.

5. It is imperative that the material information omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

6. For these reasons as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin

Defendants from holding the shareholder vote on the Proposed Merger until the material information discussed below is disclosed to Inuvo shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, federal question jurisdiction, as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Inuvo's common stock trades on the New York Stock Exchange (NYSE American), which is headquartered in this District, rendering venue in this

District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10. Plaintiff is, and has been at all relevant times, the owner of Inuvo common stock and held such stock since prior to the wrongs complained of herein.

11. Defendant Inuvo is a Delaware corporation with its principal executive offices located at 500 President Clinton Avenue, Suite 300, Little Rock, Arkansas 72201. The Company develops data, analytics and artificial intelligence technology that empowers its clients to execute their business-to-business and business-to-consumer strategies. Inuvo's common stock trades on the NYSE under the symbol "INUV."

12. Individual Defendant Richard Howe is director of Inuvo, Chairman of the Board, and Chief Executive Officer of the Company.

13. Individual Defendant G. Kent Burnett is, and has been at all relevant times, a director of Inuvo.

14. Individual Defendant Gordon Cameron is, and has been at all relevant times, Lead Director of Inuvo.

15. Individual Defendant Charles Morgan is, and has been at all relevant times, a director of Inuvo.

16. Individual Defendant Patrick Terrell is, and has been at all relevant times, a director of Inuvo.

17. The parties identified in ¶¶ 11-16 are collectively referred to as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**I.    Background and the Proposed Merger**

18.    Inuvo, incorporated on October 29, 1987, is an Internet advertising technology and digital publishing company. The Company operates through two segments: the Partner Network (advertising technology), and the Owned and Operated Network (digital publishing). The Company develops technology that delivers content and advertisements over the Internet. The Company develops direct to consumer marketing technology to acquire consumers for its content. It develops analytics and optimization technologies to align advertisements with consumers. The Company offers MYAP, which is an online affiliate management solution that provides advertisers with the ability to sign up, manage and track the activities of publishers through a privately branded platform with data transparency. Typically, each MYAP customer is supported by a customized software implementation.

19.    ConversionPoint is a private e-commerce technology company in California offering AI-enabled media optimization, customer relationship management, and robust post-purchase modules that automate product delivery and re-marketing. ConversionPoint focuses on the non-Amazon channels, including Walmart.com, Shopify.com, and BigCommerce.com.

20.    On November 5, 2018, Inuvo and ConversionPoint issued a joint press release to announce the Proposed Merger stating, in relevant part, as follows:

**Inuvo Signs Definitive Agreement to be Acquired by ConversionPoint Technologies**

November 5, 2018

Acquisition offers retailers and brands an end-to-end, AI powered, eCommerce platform with unprecedented insight into consumer behavior for stronger ROI and online sales

5

LITTLE ROCK, Ark. and NEWPORT BEACH, Calif., Nov. 05, 2018 (GLOBE NEWSWIRE) -- Inuvo, Inc. (NYSE American: INUV), a provider of artificial intelligence (AI) technology for brands and agencies, today announced that it has entered into a definitive agreement to be acquired by ConversionPoint Technologies, Inc., a privately held eCommerce technology company.

The acquisition will be a cash-and-stock transaction valued at approximately $2.22 per share of Inuvo common stock based on 34,077,624 common shares outstanding and restricted stock units that will immediately vest upon closing. Inuvo shareholders will receive $0.45 per share in cash and stock valued at an estimated $1.77 per share, or approximately$75.5 million in total consideration. ConversionPoint plans to file a Form S-4 with the Securities and Exchange Commission to register the shares of common stock to be issued in the acquisition and intends to file listing applications for the stock with the NASDAQ Capital Market and the Toronto Stock Exchange.

**Strategic Rationale for the Acquisition**

ConversionPoint is acquiring Inuvo for its patented, AI-driven consumer behavior technology, which leverages machine learning to mirror the way the human brain instantly associates ideas, emotions, places, people and objects. The combined solution is expected to offer large and small businesses a new way to compete more effectively, increase online sales, achieve higher media spend ROI and improve customer lifecycle engagement. This AI powered platform is expected to create a competitive eCommerce solution for major non-Amazon channels, such as Shopify, Big Commerce, and Walmart.com.

"Amazon controls nearly half of the $450 million in online retail sales in the U.S. thanks to their proprietary data-driven approach to consumer analysis and marketing," explained ConversionPoint CEO, Robert Tallack. "Online retailers and brands have been searching for an end-to-end data driven technology to help provide accurate information they can use to acquire customers.  We believe that together our end-to-end, AI powered, eCommerce platform can offer those capabilities to the online retail channel and the direct channel that the market has been actively searching for."

ConversionPoint's current customers include major brands like Canon, Logitech and Nikon, and its technology has been integrated onto online retailer sites like walmart.com and officedepot.com. Current ConversionPoint shareholders include Menlo Ventures, Granite Ventures and IBM. The company was recently named #93 (software) on the 2018 Inc. 5000 list of the fastest-growing companies in the U.S. with audited revenues of $49.9 million in 2017.

According to the CEO of Inuvo, Rich Howe: "With our combined technologies, data sources and industry partners, we will be able to offer an even greater level of eCommerce transparency and sophistication across small, medium and large

business segments. We see this combination allowing us to pursue a shared vision of providing more powerful solutions for eCommerce."

ConversionPoint enhances consumer product experiences, optimizes media spend, enables upsell, and manages fulfillment and retargeting. Inuvo has the industry's most capable technology for identifying and analyzing consumer behavioral data, along with direct access to advertising inventory from large media and technology partners.

Inuvo is a market leader in artificial intelligence whose goal it is to align one-to-one brand messaging with consumer intent. Inuvo customers include several Fortune 500 companies, major global brands and agencies. It has the world's most capable technology for identifying and analyzing consumer behavioral data, along with direct access to advertising inventory from large media and technology partners. Inuvo harnesses the power of its patented IP by delivering high performing campaigns reaching audiences that would typically be missed.

"Inuvo's technology and product offerings makes our combination very attractive in terms of immediate cross-selling opportunities,' said ConversionPoint CFO, Raghu Kilambi. "The scale of the combined operations coupled with the identified synergies, focused on the eCommerce market, is anticipated to provide attractive upside revenue and margin expansion opportunities as well as a unique capital market story."

According to Trey Barrett, COO of Inuvo: "We have identified a number of specific near-term opportunities, including upselling Inuvo's high-margin AI powered IntentKey media to ConversionPoint's existing enterprise customers and online retail partners. We also expect to reap significant benefits from integrating ConversionPoint's retail brands into Inuvo's ValidClick platform, creating a new traffic acquisition source for ConversionPoint clients, and utilizing ValidClick's advertising inventory throughout our customer experience."

The combined company's IP portfolio is expected to include 15 issued U.S. patents and 12 patents pending.

**Additional Transaction Details**

This acquisition transaction will be effected through a newly created holding company, ConversionPoint Holdings, Inc., where Inuvo and ConversionPoint Technologies will become wholly-owned subsidiaries of ConversionPoint Holdings.

Under the terms of the definitive agreement, ConversionPoint Holdings will issue 0.18877 shares of its common stock for each one share of Inuvo common stock (or approximately 6.4 million shares in total) and will issue cash in the amount of $0.45 for each one share of Inuvo common stock (or approximately $15.3 million in total).

ConversionPoint Holdings will issue 0.9840 shares of its common stock for each one share of ConversionPoint Technologies, Inc. common stock (or approximately 15.6 million shares in total).

The $1.77 estimated value per share of ConversionPoint Holdings common stock to be issued in the acquisition is based upon ConversionPoint Technologies' recent $15 million private offering that valued ConversionPoint Technologies' common stock at $9.21 per share, resulting in an estimated equity valuation for ConversionPoint Technologies of $146 million.

Following the closing of the transaction, and prior to the issuance of any stock in connection with a financing that is a condition to closing, Inuvo shareholders will own approximately 29% of ConversionPoint Holdings and will have received $0.45 per share in cash, or total cash consideration of $15.3 million.

Inuvo will operate as a wholly-owned subsidiary of ConversionPoint Holdings and is expected to maintain its offices in Little Rock, Arkansas and San Jose, California. ConversionPoint will operate as a wholly-owned subsidiary of ConversionPoint Holdings and is expected to maintain its offices in Newport Beach and Emeryville, California, and Minneapolis, Minnesota.

Robert Tallack, the current CEO of ConversionPoint Technologies, will become the CEO of the combined companies, and Richard Howe, the current chairman and CEO of Inuvo, will become chairman of the combined companies.

The closing of the transaction, which is expected to occur during the first quarter of 2019, is subject to customary and other closing conditions, including a requirement that ConversionPoint raises a minimum of $36 million of gross proceeds from the issuance of equity and/or debt, a portion of which will be used to fund the cash portion of the acquisition transaction, as well as the approval of the stockholders of ConversionPoint Technologies and Inuvo. All of Inuvo's directors and executive officers, as well as ConversionPoint Technologies stockholders owning 70% of ConversionPoint Technologies' outstanding shares have signed support agreements in favor of the acquisition.

Upon the closing of the acquisition, ConversionPoint Holdings expects to change its name to ConversionPoint Technologies.

For ConversionPoint Technologies, Troutman Sanders LLP served as legal advisors. ConversionPoint's financial advisors on the required debt and/or equity financing are expected to include GMP Securities L.P., Beacon Securities Ltd. and Falcon Capital.

For Inuvo, Porter Wright Morris & Arthur LLP and the Pearlman Law Group served as legal advisors. Canaccord Genuity acted as financial advisor to Inuvo.

>Additional details about this transaction will be available in a Form 8-K to be filed by Inuvo with the Securities and Exchange Commission and accessible in the investor relations section of Inuvo's website at www.investor.inuvo.com.
>
>Information regarding ConversionPoint Technologies, including audited historical financial information, may be found on its website at www.conversionpoint.com.

21. The Merger Consideration represents inadequate compensation for Inuvo shares. It is therefore imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

## II.    The Proxy Is Materially Incomplete and Misleading

22. On December 17, 2018, Inuvo filed the Proxy with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to cast an informed vote on Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

23. First, the Proxy entirely omits any of the financial projections for Inuvo, ConversionPoint, or the synergies of the combined company (the "Omitted Projections"). In connection with rendering the opinion described above and performing its related financial analyses, Canaccord "analyzed certain internal . . . projected financial and operating data concerning Inuvo provided to Canaccord by senior management of Inuvo and concerning ConversionPoint provided to Canaccord by senior management of ConversionPoint." Proxy at 156. Canaccord then "conducted discussions with members of senior management of Inuvo and ConversionPoint regarding . . . the prospects of Inuvo and ConversionPoint." *Id*. Further, "the

9

combination of Inuvo's and ConversionPoint's businesses are expected to create combined annual cost and operational synergies;" is the first reason the Inuvo Board listed for approving the Proposed Merger. Proxy at 154.

24. Furthermore, Canaccord utilized the Omitted Projections in their valuation analyses to support their fairness opinion. Indeed, the Omitted Projections served as the foundation for their: *Inuvo Selected Public Companies Analysis*; *Inuvo Selected Precedent Transactions Analysis*; *Inuvo Discounted Cash Flow Analysis*; *ConversionPoint Selected Public Companies Analysis*; *ConversionPoint Discounted Cash Flow Analysis*; and *Merger Consideration Analysis*. The failure to disclose the Omitted Projections renders the summary of each analysis misleading.

25. The Omitted Projections served as the primary reason for the Board to approve the Proposed Merger and for Canaccord to find the Merger Consideration "fair" to Inuvo shareholders. The Omitted Projections are plainly material and speak squarely to the question that the Company's shareholders must answer in determining whether to vote in favor of the Proposed Merger: is a smaller stake in the combined company more or less valuable than a full stake in the standalone company? Without the Omitted Projections, Defendants present the Company's shareholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Merger. Moreover, given that ConversionPoint is a private company, there is no public financial information for the company or public valuation that Inuvo shareholders could rely upon. Thus, the omitted financial projections are plainly material to shareholders and must be disclosed.

26. Second, in summarizing the *Discounted Cash Flow* Analyses prepared by Canaccord, the Proxy fails to disclose the following key information—in addition to the Omitted Projections—used in their analysis: (i) the inputs and assumptions underlying the calculation of

10

the Inuvo discount rate range of 19.0% to 21.0% (including the WACC and CAPM components); (ii) the inputs and assumptions underlying the calculation of the ConversionPoint discount rate range of 15.5% to 17.5% (including the WACC and CAPM components); (iii) the inputs and assumptions underlying selection of the 7.0x to 9.0x terminal multiples used to derive the terminal values for both companies; and (iv) the actual terminal values calculated for each company.

27. These key inputs are material to Inuvo shareholders, and their omission renders the summary of the *Discounted Cash Flow* Analyses incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

28. Without the above-omitted information and the Omitted Projections, Inuvo shareholders are misled as to the reasonableness or reliability of Canaccord's analysis, and unable

to properly assess the fairness of the Proposed Merger. As such, these material omissions render the summary of the *Discounted Cash Flow* Analyses included in the Proxy misleading.

29.     Third, with respect to the *Background of the Mergers*, the Proxy states that Inuvo and multiple parties entered into non-disclosure agreements, but fails to disclose whether such agreements contained a standstill provision and/or a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect. On page 87 of Annex A, the Proxy states "Inuvo shall, and shall cause each Subsidiary of Inuvo to, enforce (and not waive any provision of or release any Person from any obligations under) any non-disclosure, standstill or similar agreement to which Inuvo or any Subsidiary of Inuvo is a party . . . ." This indicates that not only standstill provisions, but also DADWs were in effect after the signing of the Merger Agreement.

30.     Accordingly, the express communication of the existence of such provisions is material to Inuvo shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. If those non-disclosure agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the descriptions of the non-disclosure agreements the Company entered into in the *Background of the Mergers* section of the Proxy misleading. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

31.     In sum, the omission the of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff and other Inuvo shareholders will be unable to cast an informed vote in connection with the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of Section 14(a) of the Exchange Act**

32.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

33.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

34.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

35. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

36. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding: (i) the financial projections for both companies; (ii) the valuation analyses performed by Canaccord; and (iii) the background of the Proposed Merger.

37. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

38. Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections and the details surrounding discussions with other interested parties and Canaccord. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review

Canaccord's analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

39.  Each of the Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it—which they were required to do carefully.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of financial projections.

40.  Inuvo is also deemed negligent as a result of the Individual Defendants negligence in preparing and reviewing the Proxy.

41.  The misrepresentations and omissions in the Proxy are material to Plaintiff and other Inuvo shareholders, and will deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

42. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43. The Individual Defendants acted as controlling persons of Inuvo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors of Inuvo, and participation in and/or awareness of the Inuvo's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Inuvo, including the content and dissemination of the statements that Plaintiff contends are materially incomplete and misleading.

44. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

45. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Inuvo, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Merger. The Proxy at issue contains the unanimous recommendation of the Board to approve the Proposed Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

46. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

47. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

48. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

49. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands relief in his favor and against the Defendants jointly and severally, as follows:

A. Preliminarily enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Merger, unless and until Defendants disclose the material information identified above that has been omitted from the Proxy;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.     Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: December 20, 2018                    Respectfully submitted,

*/s/ Juan E. Monteverde*
   Juan E. Monteverde

**MONTEVERDE & ASSOCIATES PC**
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*